UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MWI VETERINARY SUPPLY CO., <br><br>            Plaintiff, <br> v. <br><br> HARROLD M WOTTON, III and DARRROLL SOTTON, <br><br>            Defendants. | Case No. 1:12-cv-00055-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it plaintiff MWI Veterinary Supply Co.'s Motion to Dismiss Defendants' Counterclaim (Dkt. 24). The Court has determined oral argument would not significantly assist the decisional process and will decide the motions without a hearing. For the reasons expressed below, the Court will grant the motion to dismiss the fraud claim with leave to amend. The Court will also dismiss the wrongful termination and the negligent misrepresentation claims, as the defendants do not oppose dismissal of these claims. Finally, the Court will stay one aspect of the contract claim, as the parties agree it should be arbitrated. The motion to dismiss will be denied in all other respects.

# FACTS

Defendants and Counterclaimants Harold and Darroll Wotton are brothers. Harold is a biomedical engineer. In 1996, he formed a business – Securos – that designed, manufactured, and sold surgical implants and instruments for the veterinary orthopedic market. Darroll is an accountant who works in the veterinary business. In 2003, Darrell founded International Veterinary Distribution Network (which does business as "IVDN") "for the purpose of providing wholesale distribution services primarily to the veterinary industry." Shortly after forming IVDN, Darroll joined his brother at Securos as the company accountant.

In June 2007, the Wottons sold Securos and IVDN to MWI Veterinary Supply Co. They joined MWI as employees in charge of running MWI's Securos division. The Wottons allege they were fraudulently induced to sell their businesses to MWI based upon John J. Francis's (an employee of MWI) misrepresentations. Each of these representations is detailed below. The gist of all the alleged misrepresentations, however, is that Francis promised MWI would fully support and promote Securos' business and products within MWI, but failed to do so.

The Wottons further allege that despite MWI's failure to support Securos, they nevertheless managed to increase the Securos division's revenues by 200% in the four and one-half years following the transfer. The Wottons say that this performance would have entitled them to "receive substantial 'earnout' payments on September 30, 2012 . . . ." but MWI preemptively fired them to avoid making these payments.

MWI sued the Wottons around in January 2012. *Compl.,* Dkt. 1-2. MWI alleges numerous state law claims against the Wottons, including breach of contract and numerous tort claims. The Wottons counterclaimed shortly thereafter. In this motion, MWI attacks seven of the Wottons' ten claims, including those for: (1) fraud in the inducement; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; (4) misrepresentation (5) wrongful termination; (6) unjust enrichment; and (7) unfair and deceptive business practices in violation of Massachusetts statutory law.

## ANALYSIS

**1.    Count 1 – Fraud**

MWI argue that the Wottons' fraud counterclaim should be dismissed because (1) it is time barred, (2) it is based upon non-actionable statements regarding future events; and (3) it is not pled with sufficient particularity under Federal Rule of Civil Procedure 9(b). The Court will address each argument in turn, though it will first set out the elements of fraud.

To prove fraud, a plaintiff must establish the following elements: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge about its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the [representation]; (8) his rights to rely thereon; (9) his consequent and proximate injury." *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 108 P.3d 380, 386 (Idaho 2005) (internal citation omitted).

The Wottons allege that MWI defrauded them when John Francis of MWI made the following misrepresentations:

A. MWI would pay the Wottons a total of $5 million plus cash incentives to purchase the assets of Securos and IVDN;

B. MWI would set up the Securos Division as an independent division of MWI's Specialty Resources Group for the Wottons to continue the business of Securos and IVDN;

C. MWI's leadership team would fully support and promote the business and products of the Securos Division to grow it rapidly through MWI's extensive distribution network resulting in a realization of substantial cash incentives for the Wottons;

D. MWI was committed to the future success of the Securos Division;

E. MWI's sales teams would fully support and promote the business and products of the Securos Division to grow it rapidly through MWI's extensive distribution network resulting in substantial future compensation for the Wottons;

F. MWI would fully integrate the Securos Division with all of the "state of the art" office technologies of MWI;

G. MWI would provide marketing support for the Securos Division above and beyond the marketing efforts Securos and IVDN had been able to undertake on their own;

H. MWI would provide training support for the employees of the Securos Division and the sales representatives of MWI;

I. MWI would support the expansion of the Securos Division into Europe;

J. MWI would allow H. Wotton to manage the Securos Division and act as entrepreneur as he had done for more than ten (10) years;

K. MWI would allow the Wottons to assist two Securos Division vendors from Germany in retaining their relationships with Webster Veterinary ("Webster"), a competitor of MWI; and

      L.  MWI would promote the Securos Division to at least two other national distributors besides MWI, namely Webster and Butler Schein Animal Health ("Butler").

*Compl.* ¶ 16(A)-(L).

### A.    Statute of Limitations

The fraud claim is subject to a three-year statute of limitations. *See* Idaho Code § 5-218(4). The three-year clock starts ticking when a plaintiff knew, or with reasonable diligence should have known, that a fraud claim might exist. *Nerco Minerals Co. v. Morrison Knudsen Corp.*, 90 P.3d 894, 901 (Idaho 2004). Generally, the date of discovery is a fact question for the jury. *Id.*

In this case, however, the face of the counterclaim – in particular, paragraphs 25 and 26 – reveal that the Wottons discovered the falsity of MWI's misrepresentations more than three years before they filed suit. In those paragraphs, the Wottons allege that by February 2008 – four years before they sued – MWI had failed to follow through on the pre-transfer promises, causing Securos to lose money.

Paragraph 25 of the counterclaim alleges that "[c]ontrary to what J. Francis and MWI represented prior to the Transfer, the following occurred after the Transfer: . . . ." The Wottons then describe MWI's failure to follow through on the pre-transfer promises. *See Counterclaim,* ¶ 25(A) – (E). For example, they allege that MWI (1) did not have plans to integrate the Securos division into MWI's business; (2) did not support or promote Securos' business and products; (3) actively sold products that competed directly with Securos' products; (4) forced Securos to use an outdated purchasing system and offered little to no training on how to use the system or any of MWI's systems; (5)

MEMORANDUM DECISION AND ORDER - 5

did not provide marketing support; and (6) "all but eliminated" Securos' advertising budget. Then, in paragraph 26, the Wottons allege that "[d]ue to MWI's flagrant mistreatment of the SECUROS Division after the Transfer, the SECUROS Division was losing money rapidly by February 2008."

This Court is hesitant to infer knowledge of fraud. *See McCoy v. Lyons*, 820 P.2d 360, 368 (Idaho 1991) ("courts of this state should hesitate to infer knowledge of fraud"). But on these alleged facts, the only logical inference is that the Wottons discovered the fraud by February 2008. After all, according to the counterclaim, by that point MWI had "flagrantly mistreated" the Wottons by not following through on the pre-transfer promises, and the Securos division was "losing money rapidly." The Court will therefore dismiss the fraud claim, but will grant the Wottons leave to amend.

It appears that the Wottons may be able to allege sufficient facts to withstand a 12(b)(6) motion based on the statute of limitations. In their opposing papers, the Wottons indicate that they knew something was wrong by February of 2008, but MWI's most senior executives repeatedly assured them "from the date of the sale through May of 2009 and beyond that MWI fully supported SECUROS, and that the loss of customers and money were attributable to 'growing pains' following the lack of transfer; MWI's lack of experience with acquisitions similar to the transfer . . . and internal communications problems with MWI's sales force . . . ." *Opp.*, Dkt. 30, at 5 (citing H. Wotton Aff. ¶¶ 5-7)). As the Idaho Supreme Court explained in *McCoy v. Lyons*, 820 P.2d 360 (Idaho 1991), "[t]he discovery rule applicable to fraud requires more than an awareness that something may be wrong but requires knowledge of the facts constituting fraud."

MEMORANDUM DECISION AND ORDER - 6

Because it seems probable that the Wottons will be able to draft an adequate claim in terms of the limitations period, the Court will address MWI's remaining challenges to the fraud claim.

B.   **Promissory Fraud**

MWI argues that even if the fraud claim is not time-barred, the alleged misrepresentations are not actionable because they are opinions or predictions about future events. It is generally true that an "action for fraud or misrepresentation will not lie for statements of future events." *Country Cove Dev. v. May*, 150 P.3d 288 (Idaho 2006). The misrepresentation "must concern past or existing material facts." *Maroun v. Wyreless Sys., Inc.*, 114 P.3d 974 (2005). But the Idaho Supreme Court has recognized exceptions to the general rule, including this one: "if the speaker made the promise without any intent to keep it, but to induce action on the part of the promisee" the promise is actionable. *Gillespie v. Mountain Park Estates, L.L.C.*, 132 P.3d 428 (Idaho 2006) (citing *Pocatello Sec. Trust Co. v. Henry*, 206 P. 175, 177 (Idaho 1922)). To succeed under this exception, plaintiffs must plead and prove that the speaker had no intent of performing the future act when he or she made the promises. *See id.*

Here, the Wottons come very close to alleging that when Francis made the statements detailed in the counterclaim, he knew they were false. But they do not quite get there. Specifically, at paragraph 38, the Wottons allege that "MWI made the Representations in bad faith and with the intent of fraudulently inducing the Wottons to enter into the Transfer Agreements." Given that the Wottons must amend their fraud

claim anyway, the Court will require a plainer allegation that MWI had no intent to keep the promises at the time they were made.

Finally, the Court rejects the Wottons' argument that paragraph 25 of the counterclaim satisfies this requirement. That paragraph (which includes five sub-paragraphs) mainly just lays out what happened after the sale. It does not plainly speak to MWI's intent at the time the promises were made.

MWI next argues that even if the Wottons cure this defect in an amended pleading, the representations are still too vague to fit within the exception related to future acts. Here, MWI says that to be actionable, the promises relating to future events must be "discrete and 'certain act[s]' that a Court could determine whether or not performed. *Reply*, Dkt. 31, at 2.

There are a couple of problems with this argument. First, MWI is stretching a little when it suggests that the alleged representations are actionable only if they refer to "discrete" acts. The "certain acts" language MWI invokes sprang from a case where the defendant allegedly promised – falsely – that a business would succeed. The Court pointed out that these types of predictions are not actionable:

> Opinions or predictions about the anticipated profitability of a business are usually not actionable as fraud. *However, when there is an affirmative promise or statement that a certain act will be undertaken, such a statement is actionable providing the other elements of fraud are shown.*

*Hudson v. Cobbs,* 797 P.2d 1322 (Idaho 1990) (citing *Sharp v. Idaho Investment Corp*, 95 Idaho 113, 122–123 (1972) (emphasis added by *Hudson*)). In that context, it simply means that the defendants must promise to take some act, as opposed to merely making

predictions.  In that regard, *Morningstar Holding Corp. v. G2, LLC*, Case No. CV-10-439-BLW, 2011 WL 864300 (D. Idaho Mar. 10, 2011)*,* a case defendants rely upon, is distinguishable.  In *Morningstar,* this Court held that allegations "regarding [the] potential success of the recovery and timing of the recovery are the type of prospective statements not actionable in fraud."  *Id.* at *7.

Here, the Wottons allege that MWI promised to do something – *i.e*., support the Securos division after the sale in some specific ways.  *See Compl.* ¶¶ 16.F to 16.L.  They do not rely solely on MWI's alleged predictions that the Securos division would be successful.  The Court does observe, however, that some non-actionable predictions are entwined with the actionable allegations.  For example, paragraphs 16.C and 16.E allege that MWI's leadership and sales teams "would fully support and promote the business and products of the SECUROS Division to grow it rapidly through MWI's extensive distribution network resulting in" substantial "cash incentives" and "future compensation" for the Wottons.  These types of promises – specifically, the part about rapidly growing the Securos division, which would result in large payments for the Wottons – are more in the nature of non-actionable predictions, and should be omitted from any amended counterclaim.

    C.    **Particularity**

Finally, turning to MWI's third argument related to the fraud claim, the Court finds that the Wottons' fraud claim lacks particularity.

Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead each of the elements of a fraud claim with particularity – meaning that a plaintiff "must set forth

*more* than the neutral facts necessary to identify the transaction." *Cooper v. Pickett*, 137 F.3d 616, 625 (9th Cir.1997). In other words, fraud claims must be accompanied by the "who, what, when, where, and how" of the fraudulent conduct charged. *Vess v. Ciba–Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). While statements of the time, place, and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient. *Id.*

Here, the counterclaim stumbles at the beginning, as it does not specifically identify who made the alleged false promises. Granted, the counterclaim indicates that John Francis made the promises, but elsewhere it alleges that "[m]any of the misrepresentations were also made by other executives of MWI." *Counterclaim ¶* 18. This later allegation renders the "who" part of the inquiry vague and non-specific. MWI is entitled to know which individuals allegedly made which specific representations.

As for the "when" part of the inquiry, the Wottons only generally allege that the misrepresentations were made in 2007. *Counterclaim* ¶ 15. One can infer that the representations were made prior to June 2007, or in "mid-2007" given that MWI allegedly approached the Wottons in mid-2007, and the deal was struck in June of that year. But MWI is entitled to a more precise time frame – particularly given the Wotton's allegation that "multiple" individuals made false promises to them. *Accord Brown v. North Cent. F.S., Inc.,* 173 F.R.D. 658, 668 (N.D. Iowa 1997) (allegations that

**MEMORANDUM DECISION AND ORDER - 10**

misrepresentations were made in the "spring" of a particular year, or a "similarly broadly identified time frame" did not satisfy Rule 9(b)).

The counterclaim is also deficient in that it fails to particularly allege how the Wottons were damaged. The Wottons allege that, despite MWI's "poor treatment" of the Securos division, the Securos division increased its revenues and, by December 2011, had its highest sales month ever. *See Counterclaim* ¶¶ 28-29. Given these allegations, the later boilerplate allegation in the counterclaim ("[t]he Wottons reasonably relied to their detriment on the Representations, and have suffered injury due to the falsity thereof", *id.* ¶ 51) is insufficient. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (Rule 8 does not require factually detailed allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Any amended counterclaim should more specifically identify how the misrepresentations at issue harmed the Wottons.

In sum, the fraud claim, as presently drafted, is not sufficiently particular under Rule 9(b). It will therefore be dismissed for this reason as well. As already noted, however, the Court will grant the Wottons leave to amend.

**2.     Count 2 – Breach of Asset Purchase Agreements**

The Wottons' breach of contract claim is based upon the Asset Purchase Agreements underlying the June 2007 transfer of the Wottons' businesses (Securos and IVDN) to MWI. Under these agreements, the Wottons allege they are entitled to receive annual "earn-out" payments. They allege that MWI breached its obligations to pay past and future earnout payments.

Regarding the past payments, the Wottons allege that MWI "purposefully miscalculated" them. *Counterclaim* ¶ 42. This claim is easily dispensed with, however, because the parties agree that claims dealing with calculations must arbitrated. The Court will therefore stay the breach of contract claim to the extent it relies on breaches related to past earnout payments. *Cf.* 9 U.S.C. § 3 (trial court shall "on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, . . . .").

The 2012 earnout payment, however, will not become due until later this year. MWI therefore argues that this aspect of the claim must be dismissed because there is no live controversy before the Court. This argument lacks merit because MWI has preemptively stated it will not pay 2012 earnout payments, based on its contention that the Wottons have breached their obligations to MWI. *See Counterclaim* ¶ 30. It is well established that if one party anticipatorily breaches a contract, the non-breaching party may sue at once; it does not need to wait until the breach has actually occurred. *See, e.g., Foley v. Munio*, 669 P.2d 198, 200-01 (Idaho 1983). The breach of contract claim regarding the 2012 earnout payments is therefore live.

MWI next argues that accounting issues surrounding the 2012 earnout payments will eventually have to be arbitrated anyway, and urges the Court to dismiss the contract claim for that reason as well. The problem, of course, is that MWI allegedly repudiated its obligation to make any 2012 payments under the contracts. In other words, the parties have disputes other than just accounting ones and it appears that neither side is interested

in arbitrating non-accounting disputes.[1] The Court will therefore deny the motion to dismiss the breach of contract claim, as that claim relates to 2012 earnout payments. The parties should be aware, however, that if it is later determined that MWI wrongfully refused to make 2012 earnout payments, the Court would anticipate ordering the parties to arbitrate any related accounting issues.

### 3. Count 3 – Breach of the Duty of Good Faith & Fair Dealing

MWI contends that the Wottons' counterclaim for breach of the duty of good faith and fair dealing fails because it seeks to impose new contractual obligations upon MWI that are directly contrary to the fully integrated Asset Purchase Agreements. More specifically, MWI asserts that each Asset Purchase Agreement grants MWI the authority to run the businesses it purchased as it sees fit. The agreements are not quite that broad, however. They state that MWI may *change* its business (or any division's business) at any time for any reason. *See Asset Purchase Agreements*, Dkts. 2-1, 2-2, ¶ 2.5.4

---

[1] The Court will resist the temptation to rule on the arbitrability of all issues (not just accounting ones) within the breach of contract claim. The Court nonetheless observes that both Asset Purchase Agreements contain broad arbitration clauses. *See, e.g. Asset Purchase Agreement*, Dkt. 2-1, Article 10 (Remedies). Further, the Wottons previously "requested MWI to mediate the Wottons' claims against MWI [and this was how the arbitration process was to begin], but MWI refused to do so." *See Opp.*, Dkt. 30, at 13 n.4. Presumably, the Wottons filed their counterclaim some time after, only to be met with MWI's argument that part of the contract clam must be arbitrated (the part dealing with how payments are calculated). The Wottons are content to arbitrate the accounting issue, but for reasons that are not entirely clear, they now argue that "[u]nder the plain language of the APAs, the Wottons' claim for breach of contract with respect to the 2012 earnout is *not* subject to the ADR process." *Id*. at 13 (emphasis added). At the same time, however, they concede that "[t]o the extent that it is determined that MWI's refusal to make any of the 2012 earn-out payments is subject to the ADR process, the Wottons will agree to stay that part of their claim pending completion of the ADR process." *Id*. at 12 n.3. That last statement is an odd one, because neither party is moving to compel arbitration. So, at this point, the Court will assume neither party is interested in arbitrating non-accounting issues and will proceed accordingly.

("Notwithstanding anything in this Agreement, Buyer may, at its sole election, determine to change its business, or the business of any division or subsidiary of Buyer, at any time and for any reason.").

In any event, based on this contractual provision, MWI argues that the Wottons cannot rightly complain that MWI failed to take certain specific actions to support MWI's newly formed Securos division. MWI believes this would improperly inject new terms into the fully integrated contract. For example, MWI notes that the agreements do not require it to "create a commission structure to compensate its sales representatives for the sale of SECUROS Division's products" yet the Wottons complain about this very failure within their good faith and fair dealing claim. MWI then cites decisions where courts refused to inject new obligations into contracts via the covenant of good faith and fair dealing.

In crafting this argument, however, MWI focuses too narrowly on both the contracts and the counterclaim. Further, the cited cases are distinguishable.

Beginning with the contracts, MWI does not meaningfully acknowledge or discuss its contractual obligation to pay the Wottons cash incentives (the earnout payments). The central thrust of the Wottons' good faith and fair dealing claim is that MWI acted so as to impair or nullify the Wottons' right to receive the earnout payments. The fact that MWI had the contractual ability to change its business does not eviscerate the underlying implied covenant of good faith and fair dealing connected to the obligation to make earnout payments. Further, there is no allegation that MWI's alleged failure to promote Securos had something to do with a decision by MWI to change Securos' business.

MEMORANDUM DECISION AND ORDER - 14

Moving to the counterclaim, it does not rely solely on affirmative steps the Wottons believe MWI should have taken. Rather, the Wottons also allege that MWI breached the implied covenant by "[a]ctively selling and marketing products that competed directly with, and siphoned business from, the SECUROS Division's products." *Counterclaim* ¶ 47.A.

Moreover, it bears repeating that the fundamental point of the implied covenant of good faith and fair dealing is that the parties must not take actions that significantly impair any benefit of the contract. True, this implied covenant cannot be used to override existing contractual obligations, and entirely new substantive contractual terms cannot be injected into a contract. *See, e.g., Clement v. Farmers Ins. Exchange,* 766 P.2d 768, 770 (Idaho 1988). But the Wottons may properly argue that taking certain actions to support Securos was inherent in MWI's underlying obligation to make cash incentive payments. *See Jones v. Micron Tech., Inc.*, 923 P.2d 486, 492 (Idaho Ct. App. 95) ("The covenant does not create on the part of the employer a duty that is not inherent in the employment agreement.") (citing *Metcalf v. Intermountain Gas Co.,* 778 P.2d 744, 749 (Idaho 1989)).

Attempting to enforce inherent, implied terms is fundamentally different than attempting to inject an entirely new provision (a forum-selection clause, for example) into a contract that is silent on the issue. *See GMAC Real Estate, LLC v. Gate City Real Estate Pocatello, Inc.,* 2006 WL 2095324 (D. Idaho July 27, 2006). MWI's reliance on these sorts of cases is therefore unavailing.

Similarly, MWI's reliance on *Independence Lead Mines v. Hecla Mining Co.*, 137 P.3d 409 (Idaho 2006) is misplaced. In that case, the contract expressly stated that a

MEMORANDUM DECISION AND ORDER - 15

mine operator could operate the mine as it saw fit. *Id.* at 414. The plaintiff, however, insisted that the operator could not mine unless it would be profitable for the plaintiff. In other words, the plaintiff essentially sought to override a specific contractual term. The court rejected this use of the implied covenant. *Id.*

MWI attempts to fit within this case by pointing to the contractual provision that allows it to change its business whenever it wanted to. But, as already noted, the Wottons are not alleging that MWI could not change its business. Rather, they allege that MWI failed to adequately support the existing Securos division, and thus impaired their right to receive earnout payments. *Independence Lead Mines* is thus distinguishable.

In sum, the Wottons have adequately alleged a claim for breach of the implied covenant of good faith and fair dealing. The Court will therefore deny MWI's motion to dismiss this claim.

4.  **Counts 4 and 5 – Negligent Misrepresentation and Wrongful Termination**

The Wottons do not object to dismissal of the fourth or fifth claims (misrepresentation and wrongful termination). The Court will therefore dismiss these claims.

5.  **Count 6 – Unjust Enrichment**

MWI contends that the Wottons' unjust enrichment claim should be dismissed because (1) it is not sufficiently pled, and (2) it is duplicative of the Wottons' breach of contract claim. The Court is not persuaded by either argument.

As for the sufficiency of the pleading, the unjust enrichment claim falls within the liberal notice-pleading standards of Federal Rule of Civil Procedure 8(a). To adequately

plead unjust enrichment, the Wottons must allege that: (1) they conferred a benefit upon MWI; (2) MWI appreciated that benefit; and (3) under the circumstances, it would be unfair for MWI to keep the benefit without paying for it. *Vanderford Co. v. Knudson*, 165 P.3d 262, 272 (Idaho 2007).

The Wottons' unjust-enrichment claim contains just a few lines, but it incorporates prior allegations of a relatively short counterclaim. And earlier in the counterclaim, this allegation gives a reasonably clear indication of the Wottons' unjust enrichment theory:

> "Having increased the SECUROS Division's revenues 200% in 4 ½ years since the Transfer, the Wottons were due to receive substantial 'earn-out' payments in on September 30, 2012, under certain agreements the parties executed in connection with MWI's purchase of the Wottons' businesses. In order to avoid making those payments, MWI purported to terminate the Wotton brothers for 'cause on January 23, 2012."

*Counterclaim,* at 22 (Introductory Allegations). The Court therefore concludes that the unjust enrichment claim is sufficiently pled under Rule 8.

Next, MWI argues that the unjust enrichment claim should be dismissed as unnecessary because the counterclaim plainly alleges a contract between the parties. Specifically, the Asset Purchase Agreements obligate MWI to make earnout payments. And, as just noted, MWI's alleged failure to make the 2012 earnout payment forms the basis of the Wottons' unjust enrichment claim. MWI thus points to "blackletter law" holding that "[u]njust enrichment does not apply 'where there is an enforceable express contract between the parties which covers the same subject matter.'" *U.S. Welding, Inc. v. Battelle Energy Allicane, LLC,* 728 F. Supp. 2d 1110, 1116 (D. Idaho 2010) (citation omitted).

MWI's reasoning is sound, but dismissal of the unjust enrichment claim is premature because MWI has not unequivocally admitted that all contractual provisions are enforceable. *See Thomas v. Thomas* 249 P.2d 829, 837 (Idaho 2010) ("'had both Plaintiffs and Defendants . . . unequivocally admitted the existence and enforceability of all provisions of the [contract], the Court would have to dismiss Plaintiffs' unjust enrichment claim.'") (citation omitted). To be sure, in its motion, MWI generally states that the contracts at issue "are enforceable . . . ." *Mot. Memo.,* at 18 and MWI now suggests it will make the 2012 earnout payments if Securos' financial performance is sufficient to trigger the payments. *See Mot. Memo.*, at 13 ("Defendants may or may not earn a Cash Incentive payment for a particular fiscal year depending on the performance of Securos."); *Reply*, Dkt. 31, at 6 ("Even if the obligation [to make the 2012 earnout payments] does ultimately arise in 2012, . . . ."). But, on the other hand, the Wottons have alleged that in January 2012 – well before it could be determined if the Wottons would be entitled to 2012 earnout payments – MWI flatly stated that it would not make these payments. Under these circumstances, the Wottons may plead unjust enrichment as an alternative theory of relief. *See* Fed. R. Civ. P. 8(a)(3); *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp. 2d 729 (D.N.J. 2008) (court regularly permits claims for both unjust enrichment and breach of contract to proceed at the motion to dismiss stage).

7. **Count 10 – Statutory Claim for Unfair and Deceptive Business Practices**

MWI's motion to dismiss the Wottons' statutory unfair and deceptive

**MEMORANDUM DECISION AND ORDER - 18**

business practices claim hinges on the success of its motion to dismiss other tort and contract claims. Because the Court is not dismissing all these claims, the Court will not dismiss the statutory claim either.

MWI also generally argued that the statutory claim fails to the extent it arises out of the employment relationship between the Wottons and MWI. *See Manning v. Zuckerman*, 444 N.E. 2d 1262, 1263-64 (Mass. 1983) (disputes between employers and employees are not actionable under the statute). But MWI concedes that the Wottons have alleged facts arising outside the employment relationship. *See Mot. Memo.*, Dkt. 24-1 at 19. The Court will therefore deny the motion to dismiss this claim.

## ORDER

**IT IS ORDERED THAT:**

1. Plaintiff's Motion to Dismiss Defendants' Counterclaim (Dkt. 24) is **GRANTED in part** and **DENIED in part** as explained above.

2. Defendants' breach of contract counterclaim – to the extent it is based upon the alleged failure to correctly calculate pre-2012 earnout payments – is **STAYED.** All other claims shall proceed in this litigation and are not stayed.

Case 1:12-cv-00055-BLW   Document 34   Filed 07/03/12   Page 20 of 20

3. Any amended counterclaim shall be filed within 30 days of this Order.



DATED: July 3, 2012

_____
B. Lynn Winmill
Chief Judge
United States District Court

**MEMORANDUM DECISION AND ORDER - 20**