IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MWI VETERINARY SUPPLY CO., <br><br> Plaintiff, <br><br> v. <br><br> HAROLD M. WOTTON, III and DARROLL WOTTON, <br><br> Defendants. | Case No.  1:12-CV-055-BLW <br> **MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for preliminary injunction filed by plaintiff MWI. The Court heard oral argument on August 29, 2012, and took the motion under advisement.  For the reasons explained below, the Court will grant the motion.

## FACTUAL BACKGROUND

In 1997, Harold Wotton formed a business called Securos to sell products in the field of veterinary orthopedics.  Six years later he formed another business – IVDN – to provide wholesale distribution services primarily to the veterinary industry.  In 2004, Harold's brother Darroll joined Harold at Securos.

Eventually the Wottons received 5 patents for products used to make veterinary orthopedic surgery more efficient.  Securos and IVDN sold not only the patented products

**Memorandum Decision & Order - 1**

but also other items such as hand-held tools (for example, surgical scissors, scalpels and forceps), bone screws, sutures, and bandages. *See Harold Wotton Affidavit (Dkt. No. 48)* at ¶ 11.

By 2006, one of Securos main customers was Webster Veterinary Supply. *Id*. at ¶ 13. Securos granted to Webster the right to be the "exclusive reseller" of Securos's patented veterinary equipment, allowing Webster to maintain a competitive advantage over its "major competitor" – MWI – according to the Wottons. *Id*. at ¶ 16.

In 2007, MWI approached the Wottons about buying the assets of Securos/IVDN, including the 5 patents. *Id*. at ¶ 15. The Wottons understood that MWI intended, with this purchase, to (1) take away the competitive advantage Webster had as exclusive reseller of Securos's patented equipment, and (2) to expand MWI's presence on the East Coast, where Webster was the largest veterinary supply company. *Id.* at ¶ 16.

MWI and the Wottons entered into two agreements known as the Asset Purchase Agreement (APA) and the Key Employee Employment Agreement (EA).[1] The APA covered MWI's purchase of the assets of Securos/IVDN, including the 5 patents. The EA governed the terms of the Wottons' continued employment with MWI, by which they would operate what was now called the Securos/IVDN division of MWI.

Each agreement contained a separate non-compete clause that barred the Wottons from competing with MWI. The purpose of the clauses was set forth in the APA: The

---

[1] There were actually two APAs and two EAs.

**Memorandum Decision & Order - 2**

provisions were necessary to provide MWI with "a period of time to benefit from the purchase, and that [the Wottons] should be restricted from competing with [MWI's] business acquired from [the Wottons] or benefitting from the Proprietary Information and Goodwill purchased by [MWI]." *See* Exhibit 1 to Complaint (Dkt. No. 1) at ¶ 9.1.

Each clause took effect at a different time and had a different term. The APA non-compete clause started immediately – on the day of closing, June 8, 2007 – and ran for 5 years until June 8, 2012. The EA non-compete provision did not go into effect until the Wottons's employment with MWI ended, and it lasted for 2 years thereafter. Because the Wottons left MWI within the last year, the EA non-compete provision remains in effect.

The two provisions differed not only in time but also in scope. The APA provision barred the Wottons from, among other things, (1) selling any products "that were provided or sold by [IVDN/Securos] . . . prior to Closing"; and from (2) solicit[ing] any of [MWI]'s customers, clients or employees for the purpose of establishing relationships for any business or services that directly or indirectly compete with [MWI]'s business or causing any client, customer or employee to terminate any relationship with [MWI]."

The EA non-compete clause, on the other hand, states that the Wottons will not "compete" with MWI. The word "compete" is defined by the agreement to mean "to engage in the business of veterinary orthopedic equipment design, manufacture . . .[or] selling . . . ."

The Wottons signed the agreements on June 8, 2007. Pursuant to the agreements,

**Memorandum Decision & Order - 3**

MWI paid the Wottons $5 million and employed them as executives running the Securos/IVDN division of MWI.

In February of 2008, while working at MWI under the terms of the two agreements, the Wottons organized Stealth Medical LLC, and brought in Jay Ray to help with manufacturing products which, the Wottons allege, would be used for surgery on humans, not animals. *See Wotton Affidavit (Dkt. No. 48)* at ¶ 30. The Wottons allege that for the next three years, Stealth remained "an idle shell." *Id*. at ¶ 33. In 2011, Stealth purchased STAR machine which made bone screws for use on animals or humans. The Wottons leased the STAR machine to a German company, Detech, which made animal screws and sold them to MWI. The Wottons allege that they themselves never sold bone screws to MWI but simply rented the machine to Detech who sold the screws to MWI. *Id*. at ¶ 38. The Wottons further allege that Detech sold exclusively to MWI, never competed with MWI, and sold the screws at the lowest price on the market, thereby offering a substantial benefit to MWI. *Id*.

Before being purchased by MWI, the Wottons' business (Securos) purchased surgical instruments from vendors in Germany, repackaged them for individual sale, and sold them to Webster. *Id*. at ¶ 45. Immediately after the sale of Securos to MWI, Webster cut off all dealings with what was now the Securos division of MWI.

Thereafter, the Wottons, in their own words, "helped the [German] vendors to establish a direct business relationship with Webster." *Id*. at ¶ 48. Less than a year later, however, Webster decided to cease doing business with the vendors due to foreign

**Memorandum Decision & Order - 4**

currency problems and import law compliance issues. *Id*. Thereafter, the Wottons "placed the vendors in contact" with two friends of theirs – Jay Ray and Ryan Horgan – for the purpose of setting up an American company "to serve as a U.S. wholesaler for the vendors." *Id*. at ¶¶ 49,50.

To that end, Jay and Horgan created Globe Source, LLC. Globe sold to Webster the same veterinary orthopedic items – forceps, scissors, and bone screws, among other things – that Securos/IVDN sold prior to its sale to MWI. *Id*. at ¶ 69. The Wottons allege that they "did not have any connection with Globe at that point in time," *id*. at ¶ 50, and other than some reimbursements "never received a penny" from Globe. *Id*. at ¶ 69. And yet by their own admission, the Wottons facilitated the creation of Globe by introducing two friends to the vendors with the goal of selling veterinary orthopedic supplies to Webster, MWI's main competitor. *Id.* at ¶ 49.

After facilitating Globe's creation, the Wottons gave advice to its executives. The Wottons admit that in 2009, during a time the APA barred them from competing with MWI, they "would respond" to e-mails from Jay Ray and Ryan Horgan "asking for advice or contact information of certain companies." *Id*. at ¶ 51. On one occasion in 2009, Ray sent an e-mail to the Wottons asking for advice concerning a request from Webster. *Id.* at ¶ 52. The Wottons cannot recall if they responded. *Id*. The Wottons explain that in 2009, they "did not hold any positions at Globe" and thus "understood their emails to be nothing more than emails seeking advice from friends." *Id.* at ¶ 51. This explanation does nothing, however, to alter the Wottons' admission that they gave

**Memorandum Decision & Order - 5**

advice to Globe – a company set up to sell equipment to Webster – during the time they had agreed, under the APA, to not compete with MWI.

Finally, the Wottons became members of Globe: They admit that they "agreed to join Globe as members in 2010 . . . ." *Id*. at ¶ 53. The Wottons held their interest in Globe through two family trusts knows as the "MBH Family Trust 1" and the "MBH Family Trust 2." *See Ray Affidavit (Dkt. No. 49)* at ¶ 12. The undisputed public record, contained in a filing with the Massachusetts Secretary of the Commonwealth, shows that the two family trusts became members of Globe in January of 2010. *See Exhibit K (Dkt. No. 39-6)*. There is no dispute that the APA non-compete agreement was in effect during the entirety of 2010. The Wottons explain that they never "paid for our membership shares" and that they "ceased our limited involvement with Globe effective as of December 31, 2010." *Wotton Affidavit, supra,* at ¶ 53. Jay Ray asserts that although the Wottons were members of Globe during 2010, they "were not involved in the day-to-day workings of Globe." *Id.* Presently, the Wottons claim to "have absolutely no direct or indirect interest in Globe and have no intention establishing any relationship with Globe in the future." *Id*. at ¶ 60.

On June 8, 2012, the date the APA non-compete provision expired of its own terms but a date on which the EA non-compete provision was in effect, the Wottons launched a new business called Everost. *Id*. at ¶ 65. The Wottons claim they "do not plan to use Everost to compete with MWI in violation of the EA (i.e., with respect to veterinary orthopedic equipment)." *Id*. at 66. However, the Wottons do intend to sell,

**Memorandum Decision & Order - 6**

through Everost, "products such as handheld instruments (scissors, forceps, scalpels, etc.), implants, consumables, and the like in the United States, Canada, Germany, and Dubai[2] . . . ." *Id*. at ¶ 66. The Wottons interpret the EA non-compete clause to allow the sale of such products because that provision is limited to "veterinary orthopedic equipment," which, under their reading, does not include handheld instruments and consumables.

MWI filed this lawsuit in January of 2012, alleging that the Wottons breached the two non-compete clauses contained in the APA and the EA. In February of 2012, MWI filed a motion for injunctive relief, and the Court held a hearing on the motion on February 16, 2012. At that hearing, counsel for MWI represented that the Wottons had severed all ties with Globe. The Court relied on that representation, finding that there was no need for an injunction because the Wottons were not presently engaged in competition and had no imminent plans to do so.

MWI has now filed a second motion for injunctive relief. MWI argues that circumstances have changed now that (1) the Wottons have formed Everost, and (2) the record contains more detail about the Wottons' dealings during the time both non-compete provisions were in effect. The Court will analyze that motion after reviewing the legal standard governing the issuance of injunctions.

## LEGAL STANDARD

To be entitled to injunctive relief, MWI must show each of the following: (1) a

---

[2] These are the same countries declared off-limits to competition in the EA and APA non-compete clauses.

**Memorandum Decision & Order - 7**

likelihood of success on the merits; (2) that irreparable harm is likely, not just possible, if the injunction is not granted; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

## ANALYSIS

### Likelihood of Success on the Merits

The APA non-compete provision banned the Wottons from selling any products that they sold through IVDN/Securos prior to the sale to MWI. The Wottons now use Everost to sell products – handheld instruments and consumables – that they agree were sold through IVDN/Securos prior to the sale to MWI. *See Wotton Affidavit, supra* at ¶ 69. The Wottons argue, however, that Everost was not created until June 8, 2012, the date the APA non-compete clause expired. MWI responds that the Court should equitably extend the clause for a year due to the Wottons' conduct in competing with MWI through Globe during the effective period of the APA non-compete clause.

MWI cites a number of cases extending a contractual ban on competition when evidence showed that the ban was ignored during its term. Some of those cases extended the ban only after a finding by a jury (or a judge following summary judgment) that the defendant breached the ban. *See, e.g., Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361 (8th Cir. 1991) (court extended term of non-solicitation agreement following jury verdict that defendant was in breach); *TEKsystems, Inc. v. Bolton*, 2010 WL 447782 (D.Md. Feb. 4, 2010) (court extended term of non-compete agreement following grant of

**Memorandum Decision & Order - 8**

summary judgment that defendant was in breach).  These courts took the extraordinary step of extending a contractual ban – essentially by re-writing the contract between the parties – only because the record contained solid evidence that the ban had been ignored during its term.

That solid record is rarely available at the early stage in a case where TROs or even preliminary injunctions are at issue.  One such rare case occurred in Idaho.  *WGI Heavy Minerals Inc v. Gorrill,* 2006 WL 6105887 (Id.1$^{st}$Jud.Dist. April 21, 2006).  There, the court considered a request to enforce a non-compete clause and enjoin defendant from competing with plaintiff.  The case was just a few months old at the time.  Even on the basis of that meager record, it was clear the defendant was working for a company in competition with the plaintiff.  Accordingly, even though the non-compete clause had expired, the court extended the ban and issued the injunction.[3]

Another rare instance is found in a New York case.  Although the case was just a few months old, the court found a sufficient record establishing the defendant's competition with plaintiff to justify a judicial extension of the term of the non-compete clause.  *See New York Real Estate Inst., Inc. v. Edelman,* 839 N.Y.S.2d 488

---

[3] Idaho law, unlike Federal law, does not require a showing of irreparable harm as a condition for injunctive relief.  *See Id.R.Civ.P. 65(e)(2)* (requiring a showing of either "great" or "irreparable" harm).  As will be discussed further, MWI has shown irreparable harm here, and so the Court need not address whether the more lenient Idaho standard applies.  *See generally Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 646 (9th Cir. 1988) (applying state law injunction standard where it did not conflict with Fed.R.Civ.P. 65).

**Memorandum Decision & Order - 9**

(N.Y.App.Div.2007).[4]

These cases state the exception, not the rule. A solid record is required to extend a ban on competition beyond the time agreed to by the parties, and the vast majority of all cases will lack that precondition at the early stage of litigation when most motions for injunctive relief are filed. This case, however, presents one of those rare situations where a solid record exists early in the proceedings.

The Court's statement of facts, set forth above, was taken entirely from three affidavits submitted by the Wottons. Harold Wotton's affidavit contained most of the information, and it was confirmed by an affidavit filed by Harold's brother, Darroll Wotton. The third affidavit was filed by Jay Ray, the Wottons' friend and business associate.

Those three submissions by the Wottons establish that (1) The Wottons facilitated the creation of Globe so that vendors could restore their sales to Webster; (2) Globe sold to Webster the same type of veterinary supplies sold by MWI; (3) Webster competed directly with MWI; (4) The Wottons advised Globe's executives; (5) The Wottons became members of Globe in 2010; (6) The Wottons understood that MWI had purchased the Wottons' business to obtain a competitive advantage over Webster; (6) During the entire time that the events just described occurred, the Wottons had agreed, under the

---

[4] This case must be read together with the lower court opinion, *New York Real Estate Inst., Inc. v. Edelman,* 2006 WL 4470801 (N.Y.Sup.Ct. 2006), to obtain a full statement of the underlying facts.

**Memorandum Decision & Order - 10**

APA, "to not compete with [MWI]."

Even at this early stage in the case, these six points provide strong evidence that the Wottons competed with MWI by facilitating, advising, and joining Globe.[5] Globe sold to Webster, MWI's main competitor, the same type of veterinary supplies sold by MWI. Webster was no random customer of Globe's; the Wottons facilitated the creation of Globe to gain Webster's business. And once Globe was up and running, the Wottons advised its executives on operations and eventually became members in 2010. These points are all established by the Wottons' own submissions and hence provide the necessary solid record supporting the extension of the APA non-compete provision under the case law discussed above.

The Court will therefore extend the APA non-compete provision for a year, representing the time period in 2010 that the Wottons, through their two family trusts, became members of Globe. Accordingly, the Court finds that the APA remains in effect and expires on June 8, 2013.

In determining the likelihood of success on the merits, the Court notes that the Idaho courts are willing to enforce restrictive covenants negotiated as part of a sale of a business. *Bybee v. Isaac*, 178 P.3d 616, 622 (Id.Sup.Ct. 2008). While the Wottons allege that they have completely ended their involvement with Globe, they are going forward

---

[5] The Court at this early stage in the litigation is not making a finding of fact or conclusion of law on the issue. It is enough – at the injunction stage where likelihood of success is the standard – to find that strong evidence supports the extension of the non-compete clause, as set forth in the cases cited above.

**Memorandum Decision & Order - 11**

with Everost, and plan to sell handheld instruments and consumables used in veterinary orthopedic surgery like scissors, forceps, scalpels, implants, and bone screws. MWI is likely to prevail on its argument that the sale of such products violates the non-compete provision of the APA. The APA bars the Wottons from selling any products that "were provided or sold by [IVDN/Securos] . . . prior to closing," and it is undisputed that the portion of Everost's product line listed above falls into that category. For all these reasons, the Court finds it likely that MWI will prevail in its argument that Everost's sales of handheld instruments and consumables used in veterinary orthopedic surgery like scissors, forceps, scalpels, implants, and bone screws violates the APA non-compete clause that the Court has extended until June 8, 2013, and the Court will enjoin that conduct.

Even if the APA non-compete clause should not be extended, the Court finds that MWI is likely to prevail on its argument that the EA non-compete clause bars Everost's sales of these items. That non-compete provision applies to "veterinary orthopedic equipment." The Wottons argue that this phrase has a "specific industry meaning" that does not include the items they intend to sell through Everost, items like (1) one-time consumables like sutures and bandages, (2) non-reusable items like implants and bone screws, or (3) simple re-usable tools such as surgical scissors, scalpel blades, or forceps. *See Wotton Affidavit, supra* at ¶ 20.

Trade usage may be used to interpret contracts under Idaho's UCC. *See I.C. § 28-2-202.* Under the UCC, contract terms may be "explained or supplemented" by, among

**Memorandum Decision & Order - 12**

other things, the "usage of trade."  Moreover, Official Comment 1(c) to the statute "definitely rejects" any requirement that the court find an ambiguity before resorting to trade usage as an interpretation aid.

But if the Idaho UCC is not applicable, the law is quite different – in that case, trade usage, or any extrinsic evidence for that matter, may be examined only after the court has found the phrase ambiguous.  *Kepler-Fleenor v Fremont County*, 268 P.3d 1159, 1163 (Id.Sup.Ct. 2012).  "For a contract term to be ambiguous, there must be at least two different reasonable interpretations of the term, or it must be nonsensical." *Swanson v. Beco Const. Co.,* 145 Idaho 59, 62, 175 P.3d 748, 751 (2007).

Under Idaho law, an ambiguity could be either patent (on its face) or latent (as applied to the facts of the case).  *Kepler-Fleenor*, 268 P.3d at 1163.  It is likely that neither applies here.  The phrase "veterinary orthopedic equipment" does not appear on its face to be ambiguous.  The phrase simply refers to implements used on animals to correct or prevent injuries or disorders of their bones or associated structures like tendons and ligaments.  *See Merriam-Webster Dictionary (definitions of "veterinary," "orthopedic," & "equipment").*  There also appears to be no latent ambiguity when this definition is applied to the facts of this case.  While the Wottons' counsel argued that it is unclear whether the phrase refers to veterinary orthopedic implements that are merely "used" or whether it refers only to those that are "necessary," the plain meaning of the phrase would include both.

Thus, the Court could apply trade usage only if the Idaho UCC applies to the

**Memorandum Decision & Order - 13**

contracts at issue.  To answer that question, the Court must determine if the EA and APA contracts relate to the sale of goods.  *Fox v Mountain West Elec., Inc*., 52 P.3d 848, 855 (Id.Sup.Ct. 2002).  The EA contract, standing alone, is simply an employment contract and does not relate to the sale of goods.  *Id*.  The two contracts considered together involve both goods and non-goods.  The Idaho UCC applies to such mixed contracts if they are predominately for the sale of goods, and only incidentally involve the sale of non-goods.  *Id.*  In characterizing this sale, the Wottons allege that "one of MWI's main reasons for acquiring Securos was to acquire the Patented Veterinary Orthopedic Equipment."  *See Wotton Affidavit, supra* at ¶ 21.  The Wottons are referring to the crucial importance of their 5 patents in the sale to MWI.  Patents are not goods under the UCC.  *See U.S. Test, Inc. v. NDE Environmental Corp.,* 196 F.3d 1376, 1382 (Fed.Cir. 1999) (holding that "a patent is a right to exclude, not a 'good' [under the UCC]").  Thus, it appears likely that whether the EA is considered alone or together with the APA, the Idaho UCC does not apply and the Court must find ambiguity in the term "veterinary orthopedic equipment" before it can use trade usage to interpret that term.

However, as discussed above, the Court finds it unlikely that the phrase will be deemed ambiguous.  The plain meaning of the phrase covers equipment used in veterinary orthopedics such as surgical scissors, forceps, scalpel blades, implants, and bone screws.  Those are the products that the EA non-compete provision bans the Wottons from selling in competition with MWI.  Hence, it is likely that MWI will prevail on its argument that the Wottons' operation of Everost to sell those products constitutes a

**Memorandum Decision & Order - 14**

breach of the EA non-compete clause.

**Irreparable Harm**

When it purchased the Wottons' business, MWI asserts, it paid not only for the business assets but also for (1) the continued efforts of the Wottons who would be employed by MWI, and (2) their promise not to compete against MWI.  MWI further argues that by creating Everost to compete with MWI, the Wottons have not only hurt MWI financially but have also damaged the goodwill of the business.

"[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir.1991).  However, "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Id*.  Business goodwill includes a company's reputation.  *See WMX Techs. v. Miller*, 80 F.3d 1315, 1325 (9th Cir.1996).

In *Rent-A-Center*, the Circuit affirmed an injunction enjoining defendant from operating a store in violation of a non-compete agreement.  Defendant had agreed not to compete with plaintiff after selling its business to the plaintiff.  *Id*. at 599.  When defendant opened a competing store, plaintiff sought and obtained the injunction, shutting down the store.  *Id*.  On appeal, the Circuit affirmed, finding that the competing store damaged plaintiff's goodwill and constituted an intangible injury that would be difficult to value with damages.  *Id*. at 602.  The same circumstances exist here.  Without competition from the formidable Wotton brothers, MWI could expand its business and

reap the gains in reputation and goodwill that accompany success. But competition from the Wottons – in breach of the APA and EA – would reduce or take away altogether the goodwill that MWI could have gained if it was unhindered by the Wottons in the market. That loss is very difficult to quantify in monetary terms, as was recognized by *Rent-A-Center,* and that makes it likely – not just possible – that MWI will suffer an irreparable loss.

Moreover, the Wottons agreed in the APA that any breach of the non-compete clause would cause irreparable harm to MWI. *See, e.g., Exhibit 2 (Dkt. No. 2-3)* at ¶ 11.5 (provision of APA wherein Wottons agree that breach of the non-compete clause "will result in irreparable harm to [MWI] which cannot be reasonably or adequately compensated by damages"). In signing these agreements, the Wottons were represented by counsel, sophisticated in the industry, and not under any coercion or duress.

While it is not clear if Everost has actually sold any products, the Wottons have made clear their plans for the company to do so, and that is sufficient to support a finding of irreparable harm. *Stuhlbarg Intern. Sales Co., Inc. v.* John D. Brush and Co., Inc*.,* 240 F.3d 832, 841 (9th Cir. 2001) (holding that "[e]vidence of threatened loss of . . . goodwill certainly supports a finding of the possibility of irreparable harm"). For all of these reasons, the Court finds that MWI has carried its burden of showing that it will likely suffer irreparable harm.

**Balance of Equities**

An injunction will put the Wottons out of the business of supplying veterinary

orthopedic equipment in those regions covered by the APA and EA. That would appear at first glance to be a substantial hardship. But the Wottons anticipated this hardship and negotiated a deal that paid them $5 million, in part as compensation for not exercising their considerable competitive muscle. Their own foresight takes most of the sting out of an injunction that forces them to comply with their agreements. The real hardship in this case would actually fall on MWI, because if no injunction was issued, they would be denied the benefit of their bargain with the Wottons. Consequently, the Court finds that the balance of equities tips in favor of MWI.

## Public Interest

The public interest lies in enforcing contractual agreements and so favors the granting of an injunction here.

## Conclusion

MWI has carried its burden of showing all the prerequisites to obtain injunctive relief. The Court finds it likely that both the APA and EA non-compete clauses apply here and bar the Wottons from selling through Everost veterinary orthopedic equipment including (1) one-time consumables like sutures and bandages, (2) non-reusable items like implants and bone screws, or (3) re-usable tools such as surgical scissors, scalpel blades, or forceps. Accordingly the Court will grant MWI's motion.

Because of the unique fact-intensive inquiry here concerning the equitable extension of the APA non-compete clause, the Court would be receptive to a request from the Wottons for an evidentiary hearing limited solely to the extension issue. That request can be made by motion,

**Memorandum Decision & Order - 17**

and the Court will consider it in due course.  It is important to note, however, that the Court based this injunction on two grounds, independent of each other, and thus even if the APA is found to provide no support for injunctive relief, the EA continues to do so.

## ORDER

In accordance with the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for injunctive relief filed by MWI (docket no. 39) is GRANTED.

IT IS FURTHER ORDERED, that the defendants, as well as their officers, agents, employees, attorneys, and all persons who are in active concert or participation with them, are prohibited from selling through Everost, or any other entity, veterinary orthopedic equipment including (1) one-time consumables like sutures and bandages, (2) non-reusable items like implants and bone screws, or (3) re-usable tools such as surgical scissors, scalpel blades, or forceps in any of the locations set forth in the non-compete clauses of the APA and EA.

IT IS FURTHER ORDERED, that this injunction will last through the term of the non-compete provisions in the APA (as extended by the Court through June 8, 2013), and the EA.

IT IS FURTHER ORDERED, pursuant to Rule 65(c) MWI post a bond of $10,000 immediately.

IT IS FURTHER ORDERED, that the motion to strike (docket no. 61) is

**Memorandum Decision & Order - 18**

DEEMED MOOT.[6]



DATED: **September 14, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge

---

[6] The Wottons have filed a motion to strike a timeline submitted by MWI along with its reply brief, contending that it contains improper argument. The Court has not examined the document and did not use it in any way in deciding this case. Accordingly, the Court will deem the motion to strike as moot.

**Memorandum Decision & Order - 19**